TAYLOR *v.* COOPER.

Opinion delivered December 14, 1931.

*Sam Rorex, N. R. Hughes* and *Trieber & Lasley,* for appellant.

*Cockrill & Armistead,* for appellees.

*Rose, Hemingway, Cantrell & Loughborough,* for interveners.

SMITH, J. A suit was instituted by the heirs of J. H. Laster, deceased, for the purpose of partitioning a large body of land owned by their ancestor. The Exchange National Bank filed an intervention praying the foreclosure of mortgages held by it on the lands and personal property then in the hands of the receiver. Upon the motion of the bank the acting receiver was discharged and C. M. Connor, an active vice president of the bank, was appointed receiver, who qualified as such and took possession of all the property.

Connor, as receiver, was directed by the court to conduct and operate the commissary and gin on the lands and to farm the lands during the year 1930. To execute this direction the court authorized and ordered the issuance of receiver's certificates in the sum of $50,000, and $20,000 additional of such certificates were later authorized. The orders of the chancery court authorizing the issuance of these certificates provided that the certificates should be secured by all the live stock and personal property in the possession of the receiver and of all the crops to be grown and raised on the lands owned by the deceased and to secure such certificates by a pledge ''of all the income, profits and avails'' of the receivership arising by reason of the farming of said lands and the operation of the commissary and gin.

The order of the court authorizing the issuance of the certificates provided that they should be made payable on or before December 1, 1930, and should be issued from time to time in such amounts as in the judgment of the receiver and John M. Davis, president of the Exchange National Bank, might be necessary. The certificates could be issued only upon the countersignature of Davis. These certificates, when issued, were cashed and held by the bank, and when the first $50,000 of cer-

tificates had been issued and cashed by the bank a court order was obtained authorizing an additional issuance of $20,000 in certificates, it being agreed by the bank that this last issue should be upon a parity with the first issue of $50,000 and should have the same security.

The testimony in the record makes it clear that this was all done for the benefit of the bank. It held a second mortgage and desired to postpone the foreclosure of the prior mortgage. It did not want to choose between the loss of its security by the foreclosure of the prior lien and having to assume and pay that lien. In the effort of the bank to carry on and to postpone the foreclosure of the prior lien, the bank desired the receivership and caused one of its active vice presidents to be appointed receiver, and had cashed and held all the certificates which that officer issued as receiver.

Upon Connor's appointment as receiver, he employed A. C. Slaughter as plantation manager, and J. H. Rozzell as assistant manager, and G. T. Purinton was appointed manager of the commissary and bookkeeper. After making these appointments, the plantation and commissary were practically turned over to the appointees, who operated in the manner hereinafter stated. Purinton made all purchases for both the commissary and the plantation. R. H. Thompson was an active vice president of the bank, and Connor testified that whenever Slaughter came to the bank to discuss any question concerning the operation of the plantation, he was sent by the witness to Thompson. The bank's control of the business appears to have been almost as complete as it would have been had it owned the property or had itself been the receiver. Connor testified that Purinton made all purchases and drew checks signed by himself in payment, which were brought to witness for his signature as receiver. Ordinarily in paying these bills Slaughter and Purinton would come to the receiver's office, which was in the bank, and would then be sent to Thompson's desk to check over the bills and invoices.

At the beginning of the season two tractors were purchased, upon which the receiver made a cash payment of $800 and for which he signed two title-retaining notes each for the same amount, and these notes were included in the accounts presented by persons hereinafter referred to as interveners.

About July 1, 1930, Purinton furnished Connor a statement of outstanding accounts, and Connor testified that he was amazed to learn that all the receiver's certificates which he was authorized to issue had been sold to the bank, and that it would require eight or nine thousand dollars additional to finish the crop. Among the bills then due and unpaid was one of the Punkett-Jarrell Grocery Company, which company had the assurance of both Connor and Thompson that this bill would be paid.

Slaughter, the manager, testified that, while Purinton made all purchases, he did not buy anything without consulting witness and having the authorization of witness to make the purchase, and that bills covering such purchases were submitted to Thompson, the vice president, or to Davis, the president, of the bank.

Purinton's purchases appear to have exceeded the expectations of the officers of the bank, but this excess of expenditures appears to have resulted not from a lack of authority on the part of Purinton, but from a lack of supervision and direction on the part of the bank's officials to whom Purinton made report.

Purinton testified that about August 2d he took a list of outstanding and unpaid accounts to Davis and Thompson amounting to about $3,300, and he was informed by Davis' secretary that only about $1,980 was available to pay these bills, and he was then instructed by both Thompson and Davis to go to the concerns from which he had made the purchases in question "and see how many of these accounts you can stave off, and ask them if they will continue to sell the plantation the things needed for the operation of the store and the farm, until the first cotton can be harvested, at which time we will pay these bills before taking up receiver's certificates."

Witness obeyed this direction faithfully, as he testified. Purinton further testified that, on October 7, 1930, he took to Connor a list of the bills here involved, and Connor conferred with Thompson as to whether they should sell enough cotton to pay them. After this conference, Connor directed witness to tell Slaughter to sell enough cotton to pay the bills, but this order was countermanded the following day, and Purinton returned to Little Rock for further conference with Connor and Thompson. He was thereafter directed by Thompson and Davis to go to the various creditors and inform them that the cotton would be sold in October, and their accounts would be paid probably by the 1st of November, and not later than the 15th of that month, and witness so advised the creditors, and on November 1st he was advised by Thompson to buy no more goods and issue no more checks.

The claim of the Plunkett-Jarrell Company was in no manner different from that of the other creditors herein referred to as interveners, and on November 14th this claim was paid by a check drawn on the American Exchange Trust Company, this being the bank with which the Exchange Bank had merged.

The American Exchange Bank closed its doors the day after the Plunkett-Jarrell account was paid, and the affairs of the bank were taken over by the State Banking Department, and among the assets found on hand were the receiver's certificates herein set out.

The creditors whose accounts were incurred, as herein stated, after the proceeds of the sale of the receiver's certificates had been exhausted, or most of them, filed interventions in the chancery court where the receivership was pending, in which they prayed that they be first paid out of the proceeds of the cotton grown by the receiver before the receiver's certificates were ordered paid, there being insufficient funds on hand to pay all creditors. This prayer was granted, and the claims of the interveners were ordered first paid, and this appeal is from that decree.

We think, under the facts as summarized, that the Exchange Bank waived the right to insist on the prior payment of the receiver's certificates which it owned at the time of the consolidation of that bank with the bank which after the consolidation was known as the American Exchange Bank. It is true the court authorized the issuance of the receiver's certificates, and did not authorize the debts due interveners to be incurred, but the debts due the interveners were incurred under the authority of officers of the bank who were in control of the receivership. If the receiver's certificates were otherwise owned than by the bank, a different question would be presented from the one we have for decision, but the Exchange Bank and the bank which succeeded it has at all times owned these certificates, and the consolidated bank took therefore, just such title as the Exchange Bank originally had.

So therefore the question for decision appears, in effect, to be whether the bank shall, as holder of the certificates, be first paid, or whether persons who are, in effect, creditors of the bank, shall be first paid, and we answer by saying that the bank's creditors rather than the bank itself should be first paid.

Of course, the interveners are not technically creditors of the bank, but it is nevertheless true that in incurring these obligations Purinton was acting for the bank, as well as for the receiver. The total credit which the court had authorized the receiver to use had been exhausted, and, without obtaining further authorization to borrow money, the officers of the bank directed Purinton to incur obligations and to make promises of payment and to obtain indulgence in payment. Indeed, the account paid to the Plunkett-Jarrell Company was as to many of its items identical with that of the interveners, and differed only in that it was larger than the claims of all the interveners combined. There was no greater obligation, nor any more authority, to pay the Plunkett-Jarrell Company than there was to pay the claims of interveners, and we conclude therefore that the court below was correct in

holding that the claims of the interveners should be paid prior to the receiver's certificates, and that decree is affirmed.